Kenneth **ALLEN**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 49A04–0710–CR–598.

Court of Appeals of Indiana.

Sept. 24, 2008.

Monica Foster, Foster & Long–Sharp, Eric Koselke, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Kelly A. Miklos, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

In this interlocutory appeal of the trial court's denial of his motion to suppress evidence, Kenneth Allen raises the following dispositive issue: Whether he has standing to assert an unreasonable search and seizure claim pursuant to Article 1, Section 11 of the Indiana Constitution. We affirm.[1]

The facts most favorable to the trial court's decision and the uncontradicted adverse evidence follow. On February 8, 2005, Allen and his sister, Kari Allen ("Kari"), were driving west on Interstate 70 through St. Charles County, Missouri. St. Charles County Deputy Sheriff Anthony Hojsik observed Allen speeding and changing lanes without signaling and initiated a traffic stop. Deputy Hojsik approached Allen's vehicle and asked Allen for proof of registration and a driver's license. Allen produced a Florida driver's license and an Indiana identification card. Kari did not have any identification.

Allen also produced a rental agreement showing that the vehicle was rented for a one-way trip from Indianapolis to Las Vegas. He told Deputy Hojsik that he was on his way to Las Vegas to "start a new life." Tr. at 24.[2] Deputy Hojsik asked

---

1. Given our resolution of this issue, we do not address Allen's claim that the court erred in denying his motion to suppress evidence found during the execution of a search war-rant allegedly conducted in violation of the U.S. and Indiana Constitutions.

2. The record contains transcripts to hearings held on two different dates. "Tr." refers to

Allen whether he was employed, and he replied that he was not.

Deputy Hojsik asked Allen if he could search the car, and Allen consented. Deputy Hojsik found a number of identification cards, credit cards, and ATM cards in the names of Leander Bradley and Betty Bradley, who Deputy Hojsik learned were Allen and Kari's grandparents. In the trunk, Deputy Hojsik found a plastic bag with pillows, jeans, and a bloodstained bed sheet. There was also a satchel with a large amount of jewelry, a purse containing money, and a large soda bottle with a large number of cigarette butts in it. Allen and Kari's explanations regarding these items and their trip to Las Vegas were riddled with inconsistencies. Deputy Hojsik became concerned for the Bradleys' safety and contacted Indianapolis law enforcement to arrange a welfare check at the Bradleys' residence on Linwood Avenue in Indianapolis.

Indianapolis Police Officer Chris Edwards arrived at the Linwood residence first. He knocked on the front door and checked the windows. He reported that "everything was fine" and left. *Id.* at 70–71. In the meantime, Indianapolis Police Officer Michael Horn, thinking that it was unusual for an out-of-state law enforcement agency to request a welfare check, asked to be connected to Deputy Hojsik. Deputy Hojsik explained to Officer Horn why he had requested the welfare check, including the circumstances surrounding the traffic stop and the search of Allen's vehicle. Officer Horn told Deputy Hojsik that he would try to get into the Linwood residence. When he arrived, he knocked on the door loudly and circled the perimeter of the residence but did not observe anyone there.

A man across the street, neighbor Marlin Andrews, approached Officer Horn and expressed his opinion that "something's wrong in that house." *Id.* at 30. To help Officer Horn gain entry into the residence, Andrews, a locksmith, unsuccessfully attempted to pick the front door lock. Thereafter, they walked around the house and observed an air conditioning unit in one of the windows. Officer Horn removed the unit and entered the residence through the window. He unlocked the front door and looked in all the rooms but did not find anyone there. He went to the basement, where he saw a freshly poured slab of concrete. He left the house and contacted Deputy Hojsik.

Officer Horn asked Deputy Hojsik to ask the Allens what kind of vehicles the Bradleys owned. Kari described the vehicles to Deputy Hojsik, who relayed the information to Officer Horn. Kari's description confirmed that the vehicles in the driveway belonged to the Bradleys. Officer Horn told Deputy Hojsik, "They're there." *Id.* at 19. Deputy Hojsik replied, "Oh they're there?" *Id.* Kari overhead the deputy's remark and blurted out, "He killed 'em, and buried 'em in the basement." *Id.* at 20. Deputy Hojsik asked, "Who?" *Id.* She explained, "My brother killed them and buried them, and killed my mother, but I don't know what he did with her body." *Id.*

Meanwhile, Officer Horn and a supervising officer conducted a more thorough search of the Linwood residence but did not discover the Bradleys. A search warrant for the Linwood residence was issued that day and executed February 9, 2005. During the search, the basement floor was excavated and trash bags were found containing the body of Leander and the dismembered bodies of Betty and Sharon Allen, Allen and Kari's mother.

the transcript of the November 30, 2006, hearing.

During an interview with Missouri law enforcement, Allen admitted that he killed his mother and grandparents. According to Allen, he had been released from prison November 26, 2004, and began living with his mother in her Noblesville apartment. State's Ex. 1 at 82, 85, 101. Allen stated that sometime in December 2004, he killed his mother by smothering and strangling her to death. *Id.* at 87. Approximately two weeks later, Allen lured his grandmother to the Noblesville apartment and strangled her to death. *Id.* at 89–91. He took the keys to the Linwood residence from his grandmother. He drove to the Linwood residence, let himself in the house, and waited for his grandfather to come out of his bedroom. *Id.* at 93. When his grandfather came out, he hit him with a hammer and strangled him to death. *Id.*

About a week later, Allen rented a car and transported the dismembered bodies of his mother and grandmother to the Linwood residence. *Id.* at 107–09. With a rented jackhammer, Allen dug a hole through the Bradleys' basement floor into which he placed the three bodies and covered them with fresh concrete. *Id.* at 109–12. Over the next month, Allen stayed in the Linwood residence and attempted to gain access to the Bradleys' bank accounts and lines of credit. *Id.* at 101–02, 108. Allen eventually decided to go to Las Vegas. He explained, "Once I felt like things were kinda-wrapped up and I got pretty much all the credit cards I could, had all the ATM cards. That was when I was ready to just—get on out of the area." State's Ex. 2 at 252.

On February 9, 2005, the State charged Allen with three counts of murder, three counts of conspiracy to commit murder, and two counts of robbery and sought the death penalty. On June 12, 2006, Allen filed a motion to suppress all evidence obtained as a result of the February 8 and 9 searches of the Linwood residence, claiming that they violated his rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Following hearings on July 20, 2006, and November 30, 2006, the trial court issued findings of fact and conclusions thereon denying Allen's motion.[3] The trial court found, *inter alia,* that Allen did not have "standing" to bring an unreasonable search and seizure claim under either the federal or state constitutions.

On appeal, Allen claims that the trial court erred in denying his motion to suppress. We review the denial of a motion to suppress as we do other claims challenging the sufficiency of the evidence. *Starks v. State,* 846 N.E.2d 673, 678 (Ind. Ct.App.2006), *trans. denied.* We will not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's decision. *Carroll v. State,* 822 N.E.2d 1083, 1085 (Ind.Ct.App.2005). Additionally, we will consider evidence favorable to the defendant that is uncontested. *Best v. State,* 821 N.E.2d 419, 423 (Ind.Ct. App.2005), *trans. denied.* We will affirm the trial court's ruling if it is sustainable on any legal grounds apparent in the record. *Id.* at 424.

Allen challenges the trial court's finding that he did not have standing to object to the searches of the Linwood residence based on alleged violations of Article 1, Section 11 of the Indiana Constitution, which provides,

> The right of the people to be secure in their persons, houses, papers, and ef-

---

**3.** We remind Allen's counsel of the obligation under Indiana Appellate Rule 46(A)(10) to include in the appellant's brief a copy of the order from which the appeal is taken.

fects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Standing is defined as a "party's right to make a legal claim or seek judicial enforcement of a duty or right." BLACK'S LAW DICTIONARY 1442 (8th ed.2004).

We note that Allen does not dispute the trial court's ruling that he was unable to challenge the constitutionality of the searches under the Fourth Amendment. Allen does argue, however, that a different result is warranted under the Indiana Constitution because the Indiana standing analysis differs from the federal. The State agrees that there are some differences regarding "standing" under federal and state jurisprudence but disagrees as to the nature of these differences. Therefore, we will first examine the differences between the federal and state standing analyses before turning to the merits of Allen's claim.

 To establish standing pursuant to Article 1, Section 11, our supreme court has stated that "a defendant must establish ownership, control, possession, or interest in the premises searched or the property seized." *Peterson v. State,* 674 N.E.2d 528, 534 (Ind.1996). The court has also stated that a "defendant must show a subjective and objective expectation of privacy in the premises." *Campos v. State,* 885 N.E.2d 590, 598 (Ind.2008) (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). With respect to federal constitutional claims,

> Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A defendant "aggrieved by an illegal

search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises has not had any of his Fourth Amendment rights infringed." *Id.* at 134, 99 S.Ct. 421. "[I]n order to challenge a search as unconstitutional, a defendant must have a legitimate expectation of privacy in that which is searched." *Livingston v. State,* 542 N.E.2d 192, 194 (Ind.1989) (citing *Rakas v. Illinois* ). In reviewing whether a privacy expectation exists under a Fourth Amendment analysis, [the reviewing court] also looks to whether the defendant has control over or ownership in the premises searched. *Lee v. State,* 545 N.E.2d 1085, 1091 (Ind.1989); *Livingston,* 542 N.E.2d at 194; *Stout v. State,* 479 N.E.2d 563, 566 (Ind.1985). The burden is on the defendant challenging the constitutional validity of a search to demonstrate that he had a legitimate expectation in the premises searched.

*Peterson,* 674 N.E.2d at 532 (parallel citations omitted).

One difference between the federal and state analyses is terminology. In short, the U.S. Supreme Court has abandoned the concept of "standing." In *Rakas,* the United States Supreme Court determined that the "definition of those [personal] rights [that is, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties] is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." 439 U.S. at 140, 99 S.Ct. 421. Professor William Kerr of the Indiana University School of Law—Indianapolis explains,

> [T]he United States Supreme Court has traditionally stated that a person must have "standing" to object to the use of

illegally obtained evidence. In *Rakas v. Illinois,* however, the Court purported to dispense with this terminology as well as the concept of a separate and distinct requirement of "standing" in determining the admissibility of illegally obtained evidence. As suggested by the Court, the concept of "standing" should be "subsumed" under the consideration of the application of the Fourth Amendment to a particular seizure of evidence. Under this approach, the issue to be decided when a defendant seeks to suppress evidence is "whether the challenged search or seizure violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence obtained during it." At the same time, however, the Court acknowledged that *cases would probably not be decided any differently under this new approach* and that the Court did not intend to cast doubt on the decisions reached on the basis of the traditional standing analysis.

16A WILLIAM ANDREW KERR, INDIANA PRACTICE, CRIMINAL PROCEDURE § 14.5a at 358 (1998) (footnoted citations to *Rakas* omitted) (emphasis added).[4]

The principal difference between the Fourth Amendment and Article 1, Section 11 regarding the concept of standing was articulated by the Indiana Supreme Court in *Peterson:*

We note that the federal inquiry into standing under the Fourth Amendment focuses, in most part, on the defendant's privacy expectation in the premises searched. While cases interpreting our state constitutional provision have also placed significant focus on the premises searched, *independent consideration is directed to the defendant's interest in the property seized.*

674 N.E.2d at 534 (emphasis added). The court recently acknowledged this difference: "the Indiana Constitution provides protection for claimed possessions irrespective of the defendant's interest in the place where the possession was found." *Campos,* 885 N.E.2d at 598; *see also Sisk v. State,* 785 N.E.2d 271, 274 (Ind.Ct.App. 2003) ("While the inquiry into standing under the Indiana constitutional provision places a significant focus on the premises searched, like the applicable Fourth Amendment focus, independent consideration is directed to the defendant's interest in the property seized."). Notwithstanding this significant analytical difference, a review of our jurisprudence does not demonstrate much of a difference, if any, in result when a defendant's interest in seized property is not at issue.

For example, in *Peterson,* the police received the consent of the defendant's mother to search her apartment. While in the defendant's bedroom, the police seized a sawed-off shotgun found in the closet. The defendant was charged with and convicted of murder, and he appealed, arguing that the search and seizure violated his rights under the Fourth Amendment and Article 1, Section 11. Our supreme court first found that Peterson did not have a reasonable expectation of privacy in the premises searched and therefore lacked standing under the Fourth Amendment,

---

**4.** Even so, Indiana courts have continued to use the "standing" terminology when discussing Fourth Amendment claims. *See, e.g., Campos,* 885 N.E.2d at 598; *Peterson,* 674 N.E.2d at 532; *Strangeway v. State,* 720 N.E.2d 724, 726 (Ind.Ct.App.1999). On the other hand, at times we have acknowledged that the U.S. Supreme Court has dispensed with this terminology. *See Smith v. State,* 744 N.E.2d 437, 439 (Ind.2001); *Edwards v. State,* 832 N.E.2d 1072, 1075 n. 2 (Ind.Ct.App. 2005); *Best,* 821 N.E.2d at 424 n. 2; *Willis v. State,* 780 N.E.2d 423, 427 (Ind.Ct.App.2002); *Mays v. State,* 719 N.E.2d 1263, 1266 (Ind.Ct. App.1999), *trans. denied* (2000).

noting that he had no control or ownership over the bedroom because he had moved out the day before. 674 N.E.2d at 533. However, the *Peterson* court also noted that even if the defendant had continued to exhibit some control over the bedroom closet where the shotgun was found, he still had no reasonable expectation of privacy where

> [t]he apartment was leased to his mother and sister. His mother paid the rent. His mother had the sole determination as to whether or not he could reside at the apartment. His mother testified that she "often" searched the bedroom-including the closet where the evidence was located-looking for drugs the defendant may have hidden. His mother also allowed other persons to reside in the apartment and, significantly, the defendant's sister sometimes shared the bedroom at night, further diminishing any expectation of privacy he may have had. In addition, the defendant is hard-pressed to claim a privacy expectation in light of the fact that no fewer than six separate individuals had keys to the apartment · and the defendant's friend, Antoine McGee, exercised access and control over the defendant's bedroom when the defendant was not at the apartment.

*Id.* (citation and footnote omitted).

The supreme court then turned to Peterson's claim under the Indiana Constitution. After noting the difference between federal and state jurisprudence, that is, that independent consideration must be given to the evidence seized under the Indiana Constitution, the supreme court

considered the defendant's interest both in the premises *and* in the shotgun. As to the premises, the supreme court analyzed standing no differently than it had under the Fourth Amendment and summarily concluded: "As noted in our prior discussion, the defendant does not have standing to challenge the entry into his former bedroom and closet. He has shown no ownership, control, possession or interest in the premises searched." *Id.* at 534.

As for the shotgun itself, the supreme court noted that the defendant did not own the shotgun but found that he had standing under the Indiana constitution because "he had *the right* to possess the shotgun as collateral until a debt was repaid." *Id.* at 534-35 (emphasis added). Thus, implicit in the court's analysis was whether a defendant's control, possession, or interest in the property seized was legitimate.[5] Likewise, we think that any ownership, control, possession, or interest in any premises searched must be legitimate.

Despite the differences between the federal and state constitutional analyses, our supreme court has recently noted, "Many search and seizure issues are resolved in the same manner under both the Indiana and Federal Constitutions." *Campos,* 885 N.E.2d at 596. In *Campos,* state constitutional protection for a seized item was not at issue, and therefore our supreme court found that "federal precedent addressing standing of a passenger asserting an interest in a searched vehicle is equally applicable under the Indiana Constitution." *Id.* at 598. Indeed, the rights protected under the federal and state constitutions are con-

---

**5.** Contrary to Allen's assertion, mere possession of an item seized does not constitute standing. *See* Appellant's Reply Br. at 4. In fact, Indiana has declined to adopt a rule that would confer "automatic standing" on individuals accused of crimes where possession was both an element of the crime and a factor

necessary for standing to challenge a warrantless search. *Livingston,* 542 N.E.2d at 194. Also, the United States Supreme Court repudiated the "automatic standing" rule for possessory crimes in *United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

sistently described as "personal" rights. "A person's Fourth Amendment rights against unreasonable search and seizure are personal." *Best,* 821 N.E.2d at 424 (citing *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)). The Indiana Supreme Court observed that Indiana jurisprudence similarly establishes that the

> "right 'to be secure in their persons, houses, papers and effects, against unreasonable search and seizure' [under Section 11] is *a personal right* of the individual whose person, house, papers or effects are searched or seized." *Snedegar v. State,* 196 Ind. 254, 257, 146 N.E. 849, 849–50 (1925). Indiana law has also imposed a requirement of standing to challenge a search or seizure-a defendant cannot successfully object to a search of the premises of another if such search does not unlawfully invade his own privacy. *Tongut v. State,* 197 Ind. 539, 544, 151 N.E. 427, 429 (1926). If the facts fail to establish that the alleged illegal search and seizure actually concerned the person, house, papers or effects of the defendant, he will not have standing to challenge the illegality. *Earle v. State,* 194 Ind. 165, 168, 142 N.E. 405, 406 (1924).

*Peterson,* 674 N.E.2d at 533–34 (emphases added).

■ With this background in mind, we turn to the instant case. Allen does not claim that he has an interest in any seized item. Rather, his challenge is based solely on his asserted interest in the Linwood residence. Thus, as in *Campos,* state constitutional protection for claimed possessions is not at issue here. Thus, as in *Campos,* we see no reason why our resolution of this issue would be any different under the Indiana Constitution than it would be under the U.S. Constitution.

Our focus then is whether Allen has established ownership, control, possession, or interest in the premises. *See Peterson,* 674 N.E.2d at 534. Allen must also show "a subjective and objective expectation of privacy in the premises." *See Campos,* 885 N.E.2d at 598 (citing *Smith,* 442 U.S. at 740, 99 S.Ct. 2577).

> This inquiry ... normally embraces two discrete questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy—whether ... the individual has shown that he seeks to preserve [something] as private. The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable—whether ... the individual's expectation, viewed objectively, is justifiable under the circumstances.

*Smith,* 442 U.S. at 740, 99 S.Ct. 2577 (quotations and citations to *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), omitted).

■ At the suppression hearing, Allen presented evidence that he had been living at the Linwood residence for the month prior to his arrest and introduced receipts bearing his name and the Linwood address and jail records in which he claimed the Linwood address as his home address. He notes that he had the keys to the house and had left it locked, thereby arguably demonstrating his "control" over the residence. Appellant's Br. at 24–25. He further argues that he "possessed" the residence as his home, as demonstrated by the receipts and jail records. However, even assuming that he did so, Allen cannot establish standing to bring an Article 1, Section 11 claim merely by showing that he had "control" and "possession" over the Linwood residence. As *Peterson* illustrates, a defendant must show *a legitimate right* to an item seized, and we think that

requirement applies equally to the premises searched. Moreover, an objective expectation of privacy is "one that society is prepared to recognize as reasonable." *See Smith,* 442 U.S. at 740, 99 S.Ct. 2577. Thus, assuming, without deciding, that Allen successfully demonstrated that he had a subjective expectation of privacy in the premises, Allen must establish that he had a legitimate right to control and possess the residence and an objective expectation of privacy.[6] He has not.

Allen was a trespasser. He did not have the owners' permission to be on the premises. Any control and possession of the Linwood residence exercised by Allen was obtained by illegal means, i.e., the alleged murder of the rightful owners. He has made no showing that he had *a legitimate right to control and possess* the Linwood residence. *See Peterson,* 674 N.E.2d at 534–35. Any expectation of privacy he had is not one that society is prepared to recognize as reasonable, and therefore he did not have an *objective expectation of privacy* in the premises. *See Campos,* 885 N.E.2d at 598. Accordingly, we conclude that the trial court did not err in finding that Allen lacked standing to challenge the searches of the Linwood residence pursuant to Article 1, Section 11 of the Indiana Constitution.

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.

---

**6.** We observe that whether a defendant has a legitimate right to control and possess a premises may not be a question independent of whether a defendant has an objective expectation of privacy. Perhaps the first question is just one factor in answering the second.